**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOSE V. GARCIA,

       Plaintiff,

v.                                           No. CIV 15-00471 RB/KK

CLARENCE DAVIS,
LAWRENCE MONTANO,
and FRANK V. CHAVEZ, JR.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

      This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on the Issue of Probable Cause to Arrest Jose Garcia, filed on January 19, 2016 (Doc. 50) and Defendants' Cross-Motion for Summary Judgment on All Counts of the Complaint and Memorandum in Support (Doc. 64). Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court will **DENY** Plaintiff's motion and **GRANT IN PART** Defendants' motion.

## I.    Procedural Background

      Plaintiff was arrested on October 19, 2012 as part of a "buy-bust" operation that began near and ultimately ended on Plaintiff's property in Bernalillo County, New Mexico. (Doc. 26, First Am. Compl. (Am. Compl.) ¶¶ 12, 14–16, 20.) The state court trial judge found the officers did not have probable cause for Plaintiff's arrest, and the State later dismissed the criminal case against Plaintiff. (*Id.* ¶¶ 2, 32, 35.)

Plaintiff filed his First Amended Complaint in this Court alleging claims pursuant to 42 U.S.C. § 1983 and pursuant to *Bivens v. VI Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for (1) unreasonable seizure and detention (arrest without probable cause) in violation of his Fourth Amendment rights; (2) malicious prosecution and related denials of due process in violation of his Fourteenth Amendment rights; (3) unreasonable search of his home in violation of his Fourth Amendment rights; (4) unreasonable search of his person in violation of his Fourth Amendment rights; and (5) unreasonable search of his cell phone in violation of his Fourth Amendment rights. (*Id.* ¶¶ 40–69.) The parties filed their cross motions for summary judgment and later stipulated to the dismissal with prejudice of Officer Lawrence Montano. (Docs. 50, 51, 64, 65.)

## II.   Statement of Facts

In evaluating the cross motions for summary judgment, "the Court will 'consider all facts and evidence in the light most favorable to the parties opposing summary judgment.'" *AT & T Mobility Servs., LLC v. Vill. of Corrales*, 127 F. Supp. 3d 1169, 1172 (D.N.M. 2015), *aff'd*, No. 15-2069, 2016 WL 873398 (10th Cir. Mar. 8, 2016) (quoting *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1154 (10th Cir. 2014) (internal citation omitted)). The following facts are undisputed unless otherwise noted.[1]

---

[1] Defendants laid out twelve additional facts in their response to Plaintiff's motion. (Doc. 54 ¶¶ 41–52.) Plaintiff did not attempt to controvert any of the additional facts. (*See* Doc. 57.) Local rule 56.1 provides that the movant must submit "a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection." D.N.M.LR–Civ. 56.1(b). If the movant fails to specifically controvert any facts and "refer with particularity to those portions of the record upon which the movant relies[,] . . . [a]ll material facts set forth in the Response will be deemed undisputed . . . ." *Id.* "The Court will deem" Defendants' additional facts admitted except where Plaintiff "specifically controverted them as required under the Local Rules" in its later response to Defendants' cross motion. *Diaz v. City of Tucumcari*, No. CIV 11-0090 JB/CG, 2011 WL 6830410, at *1 (D.N.M. Dec. 19, 2011). (*See also* Docs. 64, 66.)

Defendant Davis, a task force officer with the Albuquerque Drug Enforcement Administration's (DEA) Region 1 Drug Task Force, served as the "case agent" for a buy-bust operation executed on October 19, 2012. (Docs. 51 ¶ 2; 51-A at 56:13–19; 54-2 at 35:1–5; 54-3 at 4:8–23.) Defendants Davis and Chavez were acting at all relevant times under color of federal law as Task Force Officers for the DEA. (Docs. 64 ¶ 1; 64-A at 4:16–18, 67:8–13, 104:22; 64-B at 8:6–14, 16:1–3, 82:19–21; 66 at 2, ¶ 1.) Defendant Davis had an established relationship with a cooperating source (CS), a person who is paid to infiltrate drug-trafficking organizations. (Doc. 51-A at 55:3–9.) The CS approached Defendant Davis with knowledge of an individual named Juan Ramon Prieto who had bragged about being able to get large quantities of cocaine. (*Id.* at 55:17–24.) The CS and Prieto had a series of conversations, and Prieto ultimately gave the CS the name and phone number of someone named Lazaro Quintero-Rosas (Quintero). (*Id.* at 56:10–12, 59:1–14.)

Defendant Davis instructed the CS to call Quintero. (*Id.* at 59:18–20.) Quintero and the CS negotiated a transaction involving the sale of a kilogram of cocaine for a price of $30,000. (Doc. 54-1 at 10:8–17.) There is no evidence that the CS mentioned Plaintiff's name during the conversations with Defendant Davis, Prieto, or Quintero prior to the transaction. (Doc. 34 (Answer) ¶ 18; Doc. 51-A at 55:15–56:9, 59:7–9.) Quintero asked the CS to meet him to conduct the transaction at 314 Mitchell, the address for a commercial lot in Albuquerque, New Mexico. (Am. Compl. ¶ 12; Doc. 51-A at 59:18–22.) Plaintiff owned the property at 314 Mitchell, which is a fenced and gated commercial lot comprised of a building Plaintiff owned and used to store tools (he had previously operated a business out of the building),[2] a residential trailer where he

---

[2] The parties refer to the building at 314 Mitchell first as an auto repair shop (Doc. 51 ¶ 7) or a garage (Doc. 54-4 ¶ 7), and later—after conducting Plaintiff's deposition—as a commercial property (Doc. 64 ¶ 6) or simply "the business"

3

lived, and other space he rented out to various individuals. (Am. Compl. ¶¶ 3, 12–13; Docs. 51-D at 54:8–10, 72:20–73:4; 64-D at 3:13–15 4:8–5:14, 23:9–24:14; 66-2 at 8:6–17.) Quintero rented the building at 314 Mitchell from Plaintiff. (Am. Compl. ¶ 13; Doc. 64-F at 15:16–19; Docs. 66-2 at 5:7–12, 19:8–14; 66-3 at 6:30–7:5.)

Defendant Davis did not want to conduct the transaction at 314 Mitchell; he believed the cul-de-sac outside of the property would be difficult for the officers to secure. (Docs. 54-4 ¶ 4; 64-A at 39:20–40:9.) He had safety concerns, because agents surveilling the location prior to the transaction advised him they had seen other individuals going and coming from the building. (Docs. 54-1 at 18:8–16; 54-4 ¶ 4; 64-A at 41:8–11.) Defendant Davis had experience[3] conducting investigations in that area of town, and he knew it to be a high crime area due to drugs and violence. (Docs. 54-1 at 18:17–25; 54-4 ¶ 5; 64-A at 41:13–24, 87:4–8.) In fact, another DEA agent informed Defendant Davis that he and other DEA officials had been to that building during a previous drug investigation. (Doc. 64-A at 41:13–17, 49:13–14, 52:11–22.) Finally, Defendant Davis knew that drug traffickers often protect their drugs with firearms, and there was a serious danger of violence toward law enforcement personnel at the transaction due to the large quantity of drugs and money present. (Docs. 54-4 ¶ 6; 64-A at 88:8–16.)

Despite the CS's attempts to move the transaction to a public parking lot or similar area (Docs. 51-D at 55:2–5; 54-3 at 85:14–22; 64-A at 40:5–24), Quintero would only agree to the transaction at 314 Mitchell (Docs. 51-D at 55:2–10; 54-3 at 40:10–25, 85:14–86:1). Once the CS arrived at the street in front of the building, the CS continued to ask to move the transaction away

---

or "the building" (*id.* ¶¶ 12, 20). The Court will refer to the building at 314 Mitchell as "the building," as distinguished from "the trailer," Plaintiff's part-time residence. (*See* Doc. 66-2 at 6:24–7:11.)

[3] It is undisputed that Defendant Davis has attended hundreds or thousands of hours of narcotics training, he currently teaches a class on drug cartels, and he is familiar with how drug operators work through his 19 years as a plainclothes investigator. (Docs. 64 ¶17; 66 ¶ 17.)

from that location, but Quintero encouraged the CS to move the transaction inside of the building at 314 Mitchell, assuring the CS that only he and his "boss" were present. (Docs. 51-D at 55:9–12; 64-A at 41:4–6, 85:2—86:1.)

At approximately 1:15 p.m. on October 19, 2012, Quintero attempted to sell a kilogram of cocaine to the CS on the street outside of Plaintiff's building at 314 Mitchell. (Answer ¶ 12.) Officer Montano[4] conducted aerial surveillance during the transaction, and several other officers, including Defendant Davis, were on the ground and in radio contact with Officer Montano (*Id.* ¶ 14; Docs. 51-A at 77:6–25; 51-C at 18:2–11; 51-E at 25:17–22.) At some point during the transaction, Officer Montano communicated to the other officers that there was an individual (whom we now know was Plaintiff) at the back door or "bay door" of the building. (Docs. 54-1 at 131:4–6; 54-3 at 43:5–11.) Officer Montano may have referred to the individual as a lookout. (Doc. 54-1 at 131:7–8.) While the bay door was on the south side of the building, opposite of where the transaction took place on the "east/north" side of the building (Doc. 51-C at 21:5–11), Defendant Davis—who could not see Plaintiff or the property at that time—assumed Plaintiff was watching the transaction (Doc. 51-A at 77:4–17). Officer Montano later admitted that it would likely have been impossible for Plaintiff to have seen the transaction because he was on the opposite side of the building from the transaction, and there were no doors or windows Plaintiff could have seen through. (*See* Docs. 51-C at 21:1–11; 54-2 at 20:6–15.) There is no testimony, however, that Officer Montano, Defendant Davis, or any other officer was aware of this at the time of the transaction. They were working under the assumption that Plaintiff was acting as a lookout. (Docs. 51-A at 77:6–12; 51-C at 21:5–15; 54-1 at 131:7–8.)

---

[4] Officer Lawrence Montano was a defendant in this case, but the parties filed a joint motion to dismiss with prejudice all claims against Officer Montano on May 11, 2016. (Doc. 65.)

At some point during the transaction, a "bust signal" was given, and law enforcement personnel drove to the location to interrupt the transaction. (Docs. 54-5 at 80:1–5; 66-7 at 23:19–25.) When the DEA agents and Task Force Officers attempted to arrest Quintero on the street near 314 Mitchell, Quintero fled into Plaintiff's building and tossed the cocaine into the bed of a pickup truck Plaintiff owned. (Answer ¶ 16; Docs. 66-1 at 13:10–14:2; 66-3 at 4:3–9; 66-8 at 2 ¶ 8.) Plaintiff asserts that certain unidentified officers entered the building, pointed their weapons at him, and asked him to get on the ground. (Doc. 66-2 at 17:17–18:1.) Plaintiff testified that he did not go to the ground because he did not know what was going on; consequently, an unidentified officer grabbed Plaintiff by his neck and put him on his knees. (*Id.* at 17:19–18:10.) Officers handcuffed and detained both Quintero and Plaintiff, but it is not clear from the record who handcuffed Plaintiff; Defendant Davis testified he cannot remember whether he handcuffed Plaintiff or Quintero. (Answer ¶ 15; Docs. 51-D at 47:9–16; 64-C at 26:23–25.) Defendant Chavez did not participate in the initial decision to detain Plaintiff; by the time he arrived at the building, both men were already handcuffed. (Docs. 54-5 at 80:7–8; 64-B at 80:9–12.)

Quintero admitted to Defendants Davis and Chavez[5] that he had attempted to sell the cocaine to the CS, but Quintero did not admit to ownership of the cocaine. (Docs. 64-A at 42:22–23; 66-3 at 1:5–6, 3:25–4:25, 5:36–42.) Quintero identified Plaintiff as the owner of the building and indicated that he (Quintero) worked at the building doing "mechanical things." (Doc. 66-3 at 5:16–30, 6:30–7:5; *see also* Doc. 51-D at 52:5–10.) Quintero never verbally implicated Plaintiff

---

[5] Defendant Chavez asserts that he did not question Plaintiff, as he does not have strong Spanish-speaking skills. (*See* Doc. 64-B at 80:13–16, 81:2–4.) The Court notes, however, that Defendant Chavez is listed as a participant in both Plaintiff's and Qintero's interviews, and there is evidence he asked Plaintiff several questions. (*See* Docs. 66-1 at 1, 8:7, 11:10, 14:23–15:24; 66-3 at 1.)

as being involved in the transaction; when Defendant Davis asked Quintero if Plaintiff knew what was going on, Quintero replied, "Well, no." (Doc. 66-3 at 5:44–46.)

After ending Quintero's interview at 1:52 p.m. (Doc. 66-3 at 10), Defendants Davis and Chavez placed Plaintiff, handcuffed, into a car,[6] Mirandized him, and questioned him beginning at 1:55 p.m., forty minutes after officers interrupted the narcotics transaction.[7] (Answer ¶ 20; Docs. 51-A at 80:13–25; 66-1 at 1; 70-H at 2:1.) Plaintiff identified himself as the building owner and denied any knowledge of the narcotics transaction. (Doc. 51-D at 54:8–13; Doc. 70-H at 7:15–23, 11:16–17, 13:2–9.) Defendant Davis asked Plaintiff several questions about the ownership of certain vehicles on the property and the relationship between Plaintiff and Quintero. (Doc. 70-H at 8:7–14, 11:2–11, 13:10–14, 14:7–15:14.) Defendant Davis thought it was odd that Plaintiff, who told Davis he performs mechanic work and "makes deals" to earn his money, could not remember who the vehicles on the property belonged to. (Docs. 51-D at 73:1–4; 70-H at 2:21–23, 3:6–7, 20:17–20.) Plaintiff said that he did not have any business records for work done on the property, but he stated that he might have receipts. (Docs. 64-A at 43:23–44:7; 70-H at 11:14–13:11; 21:2–7.) Plaintiff denied that he paid Quintero and claimed that Quintero did his own work while renting Plaintiff's building and got his own payments. (Docs. 64-A at 43:15–17, 88:18–21; 70-H at 15:15–22.) It appears Plaintiff also tried to explain that he was currently working elsewhere and not on the property at 314 Mitchell. (Doc. 70-H at 11:20–12:2.)

Plaintiff told Defendants that he saw Quintero coming from a trailer on the property that belonged to Máximo Burciaga, another individual who worked nights and stayed at the trailer.

---

[6] Plaintiff asserts that Defendant Davis questioned him outside, not in a car. (Doc. 66-2 at 16:20–24.)

[7] Plaintiff testified it was about two hours from the time he first saw the officers until they questioned him (Doc 66-2 at 38:16–19), but there is reliable evidence that Defendant Davis began the interview at 1:55 p.m. (*See* Doc. 70-H at 2:1 (noting for the recording that the time was 13:55.) Defendant Davis also testified that after he questioned Plaintiff, he left to obtain a search warrant. (Doc. 51-D at 55:14–20.)

(Doc. 66-1 at 7:14–15, 8:2–22.) The officers found two sets of scales at the Burciaga trailer in a subsequent search. (Doc. 64-A at 59:11–21.) At some point, officers also found a phone in Plaintiff's possession; Plaintiff denied the phone belonged to him. (Docs. 54-3 at 89:17–18; 66-2 at 19:24–22:11; 70-H at 4:19–5:13.) Defendant Davis, who admits that he does not speak fluent Spanish, conducted the interview with Plaintiff in Spanish. (Doc. 51-D at 55:6–9; *see also* Doc. 70-H at 1 (noting that the italicized portions of the transcript were spoken in English, the rest was spoken in Spanish).)

Soon after the officers interrupted the transaction and Quintero and Plaintiff were handcuffed, officers secured the property to ensure their safety. (Doc. 64-A at 51:7–14.) Defendant Davis describes securing the property as a "cursory search" of the building. (Doc. 51-D at 51:7–19.) The timeline of the cursory search versus the full search pursuant to the warrant is somewhat hazy, however, and the parties dispute whether Defendant Chavez conducted a full search of the building before or after Defendant Davis secured the search warrant. (*See* Doc. 66 ¶ 37 (citing Doc. 66-8 at 1 ¶¶ 12, 13, at 2 ¶ 8).) Defendant Chavez testified that the officers waited until Defendant Davis secured the search warrant to photograph and perform a full search of the property. (Doc. 64-B at 81:23–82:6.) The supplemental reports of Agent Oscar "OV" Villegas and Defendant Chavez raise a question about this assertion. (*See* Doc. 66-8.) Agent Villegas reported that he assisted in securing the property, and he photographed the property, warehouse, and prisoners. (*Id.* Villegas's Supp. Report at ¶ 8.) The report goes on to state that an agent located the package of cocaine, and Agent Villegas photographed it. (*Id.*) In the next paragraph, Agent Villegas asserts that he helped maintain security "until TFO Davis obtained a District Court Narcotics search warrant." (*Id.* ¶ 9.) He then describes searching the two trailers on the property. (*Id.* ¶¶ 10–11.) Defendant Chavez's supplemental report stated that "[o]nce the property was

8

photographed by Agent O. Villegas, Agent Chavez began a search." (*Id.*, Chavez's Supp. Report at ¶ 12.) It is not clear to the Court whether Villegas photographed and Defendant Chavez searched the building before or after Defendant Davis secured the warrant.

Defendant Chavez testified that between 30 and 50 individuals showed up sometime after 5:00 p.m. during the search, stating that their vehicles needed repair and they were there to talk to "Jose."[8] (Docs. 64-B at 38:11–25; 66-8 at 1 ¶ 13.) Conversely, Defendant Davis testified it was his understanding that many of the individuals who came to buy narcotics were there while he was away securing the warrant, which would have been prior to approximately 6:45 p.m. (Doc. 64-A at 74:7–76:7.) Plaintiff's testimony is of little assistance in establishing a timeline, as he admitted he did not pay much attention to what the officers were doing on the property. (Doc. 64-D at 24:15–25:8.)

Sometime after the officers interviewed Quintero and Plaintiff, Defendant Davis left the premises to obtain a search warrant. (Doc. 51-D at 55:14–20.) Defendant Davis first read the affidavit for the search warrant over the phone to an Assistant District Attorney (ADA). (*Id.* at 56:10–15.) The ADA did not think there was sufficient cause to issue a search warrant at that point. (*Id.* at 56:16–18; Doc. 54-1 at 37:14–19.) Dissatisfied with this response, Defendant Davis called Chris Schultz, another ADA who was the supervisor of the first ADA. (Doc. 51-D at 56:19–57:13.) After Defendant Davis read ADA Schultz the affidavit, ADA Schultz told him he was "good to go." (*Id.* at 57:14–17.) The search warrant was issued at approximately 6:45 p.m. on October 19,

---

[8] Plaintiff also disputes that 30 to 50 individuals stopped by the property to purchase narcotics and references Defendant Davis's testimony that "two or three [individuals] . . . said they were there to purchase drugs." (*See* Doc. 66 ¶ 31 (citing Doc. 66-4 at 75:5–6).) Defendant Davis's testimony, however, was only about the individuals he personally interviewed. (Doc. 66-4 at 75:5–6.) He is not testifying there about the individuals who arrived while he was away securing the warrant. (*See* Doc. 64-B at 38:11–25.)

2012. (Answer ¶ 24.) Plaintiff had been detained for approximately five hours while the officers waited for the warrant. (*Id.* ¶¶ 12, 20, 24.)

Officers searched the two trailers on the lot (Plaintiff's and Burciaga's) as well as Plaintiff's building. (Docs. 64-B at 81:6–82:18; 66-8 at 2 ¶¶ 10–11.) Officers found no drugs or evidence of any kind in Plaintiff's trailer; they did find one or two handguns, but Defendant Davis did not believe there was probable cause that they were being used in furtherance of a drug crime because they were not in close proximity to the drugs. (Doc. 64-A at 59:20–61:3.) During the search of the building, Defendant Chavez found the kilogram of the cocaine in the bed of Plaintiff's truck; he also found, in a fireplace, an empty box of sandwich bags and a baggie with a corner cut off, "which is commonly used when packaging controlled substances." (Doc. 66-8 at 1 ¶12.) He specifically searched for business records, but he did not find any records related to auto parts. (Doc. 64-B at 82:14–18.) He noted there were "very little tools[,] and the vehicles inside the shop area were dusty[,] appearing to have been parked there for some time." (Doc. 66-8 at 1 ¶ 13.)

Defendant Davis believed he had probable cause to arrest Plaintiff based on the following: (1) Quintero insisted on meeting at 314 Mitchell (Doc. 54-3 at 85:10–22); (2) Quintero said "it's just me and my boss" to the CS and tried to lure the CS onto Plaintiff's property (*id.* at 85:23–86:1); (3) officers observed traffic coming and going to and from the property in the time prior to the transaction, which in Defendant Davis's experience is consistent with quick purchases of drugs (*id.* at 86:15–22); (4) Officer Montano identified Plaintiff as possibly acting as a lookout (*id.* at 86:24–87:2); (5) the area where Plaintiff's property is located is a prominent area for drug dealing (*id.* at 87:4–14); (6) Defendant Davis did not think the appearance of the building was consistent with being an active mechanics' shop—he did not see a cash register, a lift, jacks, greasy mechanics, grease on Quintero's or Plaintiff's hands or clothes, or a business office (*id.* at 87:14–

21; Doc. 64-A at 65:17–19); (7) in Defendant Davis's experience, the person handling the drugs is often not the owner of the drugs, and the owner is often close to the transaction in order to protect the drugs and to ensure the owner is not being cheated by the employee (Doc. 54-3 at 87:22–88:16); (8) during the investigation, Quintero told Defendant Davis that Plaintiff owns the building, yet there were no employee records on site (*id.* at 88:18–89:13); (9) Defendant Davis asserts that officers found a phone on Plaintiff, which contained a text Davis believes said something like "Jose I need a fifty" (*id.* at 89:17–18; Docs. 64-A at 19:19–20:14; 66 ¶ 41); (10) many cars came and went during the investigation and search, and it became apparent that the visitors were there to buy drugs (in one instance, an individual handed Quintero a $20 bill while in the presence of Davis, who was in uniform, and then admitted he was there to buy cocaine (Doc. 54-3 at 89:18–90:11, 90:25–91:19); (11) Plaintiff lived on the property and owned the building, and Defendant Davis thought that Plaintiff ought to know there were drugs being sold on the property (*id.* at 90:12–24); (12) another agent told Defendant Davis he had been to that building on a previous drug investigation (*id.* at 92:2–4); and (13) Plaintiff could not tell Defendant Davis the names of his customers who had vehicles on the property (*id.* at 92:5–11).[9]

Plaintiff was ultimately transported from the scene sometime after his arrest and remained in jail for two days. (Am. Compl. ¶ 29; Answer ¶ 27.) Plaintiff was charged with two drug trafficking felonies. (Am. Compl. ¶ 31; Answer ¶ 31.) In a hearing on October 28, 2014, a judge of the Second Judicial District Court, State of New Mexico, found that Officer Montano's aerial surveillance of Plaintiff's property violated Plaintiff's rights under Article II, Section 10 of the New Mexico Constitution. (Am. Compl. ¶ 32; Answer ¶ 32.) The district court judge also found

---

[9] Plaintiff disputes several of the factors that went into Defendant Davis's probable cause determination. (*See* Doc. 66.) The Court will address these in Part IV(C) of this opinion.

no credible evidence presented that Plaintiff was operating as a "lookout" or had any involvement in the case prior to his arrest. (Am. Compl. ¶¶ 33–34; Answer ¶¶ 33–34.) The judge concluded that there was no credible evidence supporting probable cause for Plaintiff's arrest. (Am. Compl. ¶ 35; Answer ¶ 35.)

## III.   Legal Standards

### A.   Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. In cases where the moving party will not bear the burden of persuasion at trial, the movant bears the initial responsibility of identifying "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). The nonmoving party may not rely merely on allegations or denials in its own pleadings. Fed. R. Civ.

P. 56(e); *see also Celotex*, 477 U.S. at 324. Additionally, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted). Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Florom v. Elliott Mfg.*, 867 F.2d 570, 574 (10th Cir. 1989) (citation omitted), "the burden on the moving party may be discharged by" demonstrating to the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Osuagwu v. Gila Reg'l Med. Ctr.*, 938 F. Supp. 2d 1142, 1146 (D.N.M. 2012) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (internal citations omitted)). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is 'inappropriate if disputes remain as to material facts.'" *Id.* (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal citations omitted)). "[W]hen faced with cross-motions for summary judgment, the Court is 'entitled to assume that no evidence needs to be considered other than that filed by the parties.'" *AT & T Mobility Servs., LLC*, 127 F. Supp. 3d at 1172 (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (internal citation omitted)). "Where the facts are not in dispute and the parties only disagree about whether the actions were constitutional, summary disposition is appropriate." *Osuagwu*, 938 F. Supp. 2d at 1146 (citing Fed. R. Civ. P. 56(c)).

### B.   Law Regarding Qualified Immunity

The qualified immunity defense "protects law enforcement officials who are required to exercise their discretion by shielding them from liability for harm caused by reasonable mistakes."

13

*G.M. ex rel B.M. v. Casalduc*, 982 F. Supp. 2d 1235, 1241 (D.N.M. 2013) (citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity grants such officials "an entitlement not to stand trial or face the other burdens of litigation . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

"When a defendant moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff to demonstrate, on the facts alleged, that (1) the defendant violated her constitutional or statutory rights and (2) the right was clearly established at the time of the alleged unlawful activity." *Castillo v. Day*, 790 F.3d 1013, 1019 (10th Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "A right is clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Casalduc*, 982 F. Supp. 2d at 1241 (quoting *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013)). In other words, in the light of pre-existing law, the unlawfulness of the official's actions must be apparent. *Id.* "If the plaintiff cannot meet either part of this burden, the defendant is entitled to qualified immunity." *Castillo*, 790 F.3d at 1019 (citing *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1199 (10th Cir. 2009)). The Court may address either prong of the two-step analysis first. *Casalduc*, 982 F. Supp. 2d at 1242 (citing *Courtney*, 722 F.3d at 1222).

**IV.    Discussion on Count I: Unreasonable Seizure and Detention**

    **A.    Collateral estoppel does not apply to this case.**

Plaintiff first argues that Defendants should be precluded from re-litigating the issue of whether they had probable cause to arrest Plaintiff, as the district court judge already determined they did not have probable cause for Plaintiff's arrest. (Doc. 51 at 8–13.) "Congress has directed federal courts to look principally to *state* law in deciding what effect to give state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 466 (2006). The Court will look to New Mexico law to determine whether Plaintiffs' claims are precluded by collateral estoppel.

    **1.    The law on collateral estoppel**

"[C]ollateral estoppel promotes judicial economy and protects parties from endless relitigation." *Deflon v. Sawyers*, 137 P.3d 577, 582 (N.M. 2006) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979) (internal citation omitted)). The purpose of collateral estoppel, also called issue preclusion, "is to aid in the finality of judgments by preventing parties from endlessly relitigating the same issues under the guise of different causes of action." *Edwards v. First Fed. Sav. & Loan Ass'n of Clovis*, 696 P.2d 484, 487–88 (N.M. Ct. App. 1985) (quoting *Adams v. United Steelworkers of Am., AFL-CIO*, 640 P.2d 475, 479 (N.M. 1982)). The party asserting collateral estoppel must prove four elements. *Reeves v. Wimberly*, 755 P.2d 75, 79 (N.M. Ct. App. 1988) (citations omitted). First, "the party against whom collateral estoppel is asserted must be the same party or be in privity with the party to the original action;" second, "the subject matter or the cause of action in the two suits must be different;" third, "the ultimate facts or issues must have been actually litigated; and" fourth, "the issue must have been necessarily determined." *State v. Bishop*, 832 P.2d 793, 795 (N.M. Ct. App. 1992) (citing *Reeves*, 755 P.2d at 77 (internal citations omitted)). Even if the party can establish all four elements, the district court has discretion

to determine whether applying collateral estoppel would be fundamentally unfair. *Reeves*, 755 P.2d at 78. "Fundamental fairness requires that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate." *Silva v. State*, 745 P.2d 380, 382 (N.M. 1987).

### 2.   Plaintiff has not met his burden to prove collateral estoppel applies.

Plaintiff cannot show that collateral estoppel applies, because the issue of qualified immunity was not determined in the state case, and the Defendants are not in privity with any party in the state case. Plaintiff asserts that the issues are the same—whether Defendants had probable cause to arrest Plaintiff. (Doc. 51 at 9.) Defendants assert that the issue goes beyond that of probable cause decided by the district court judge; in this case the issue is whether the Defendants violated Plaintiff's constitutional rights or are protected by qualified immunity for their determination of probable cause. (Doc. 54 at 10.) Defendants are correct. "A party is precluded from litigating an issue only if he or she has had a full and fair opportunity to litigate the issue in the prior action." *McFarland v. Childers*, 212 F.3d 1178, 1185 (10th Cir. 2000) (quotations omitted). Defendants did not have an opportunity to litigate the issue of qualified immunity in the criminal proceeding.

Plaintiff has also failed to demonstrate that Defendants are in privity with the State in the earlier case. "Privity requires, at a minimum, a substantial identity between the issues in controversy and showing that the parties in the two actions are really and substantially in interest the same." *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1174 (10th Cir. 1979) (citations omitted) (*quoted in Deflon*, 137 P.2d at 580). "Privity has been held to exist in the following relationships: concurrent relationship to the same property right (i.e. trustee and beneficiary); successive relationship to the same property or right (i.e. seller or buyer); or representation of the interests of the same person." *Deflon*, 137 P.2d at 580 (quoting *Lowell Staats*

*Mining Co., Inc. v. Phila. Elec. Co.*, 878 F.2d 1271, 1275 (10th Cir. 1989) (internal citation omitted)).

The district attorney, the party in the criminal trial with whom Plaintiff asserts Defendants are in privity, "is elected by voters to make prosecutorial decisions in the best interests of the people of the state." *State v. Torres*, No. 30,139, 2011 WL 2041584, at *3 (N.M. Ct. App. Feb. 10, 2011) (citing *State v. Brule*, 981 P.2d 782, 787 (N.M. 1999) (internal citation omitted)). The Defendants' interests are not in line with the district attorney's interests. Defendants "are being sued in their individual capacity in this action and their personal interests, which were not at stake in the criminal proceeding, differ from [the prosecution's] interests." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1006 (10th Cir. 1998) (citations omitted). Defendants "had no control over the prosecution of the criminal case and their role 'at the . . . hearing was simply that of a witness for the prosecution.'" *Id.* (quoting *Duncan v. Clements*, 744 F.2d 48, 52 (8th Cir. 1984)). "The officers 'could not call witnesses, direct the examination of the State's witnesses, or choose the counsel who represented the State at the suppression hearing. Nor could the officers appeal the ruling once it was made." *Id.* (citations, ellipses, and brackets omitted).

Plaintiff argues that *Kinslow* was based on Oklahoma law and should not apply where New Mexico courts have not determined whether a police officer is in privity with the State for purposes of collateral estoppel in a civil proceeding. (Doc. 51 at 11.) The Court notes, however, that "New Mexico follows federal law on collateral estoppel." *Phillips v. Franco*, 612 F. Supp. 2d 1190, 1194 n.4 (D.N.M. 2009) (citing *Deflon*, 137 P.3d at 580 ("federal law and New Mexico law are not divergent on [collateral estoppel] doctrine.")). Similarly, "the requirements for collateral estoppel under federal law appear to be substantially the same as under Oklahoma law." *Kinslow*, 158 F.3d at 1106 n.1 (*comparing Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d

683, 687 (10th Cir. 1992), *with Fent v. Okla. Nat. Gas Co.*, 898 P.2d 126, 133–34 (Okla. 1994), *and Adamson v. Dayton Hudson Corp.*, 774 P.2d 478, 480 (Okla. App. 1989)).

Ultimately, the Court does not reach the issue of whether the officers had probable cause to arrest Plaintiff, as the Court can grant Defendants' motion on the issue of whether a reasonable officer *could have believed* probable cause existed. Plaintiff's remaining arguments are unavailing. The Court finds that collateral estoppel does not apply.

### B.   The initial encounter between Plaintiff and Defendants was a lawful investigative detention.

Plaintiff's primary contention in his motion for summary judgment is that the initial encounter between Plaintiff and the officers at approximately 1:15 p.m. was an unlawful arrest unsupported by probable cause. (Doc. 51 at 13–21.) To begin, the Court must answer what type of police-citizen encounter initially occurred between Plaintiff and Defendants.

### 1.   The law regarding unreasonable seizures

"The Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (citing *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir.), *cert. denied*, 467 U.S. 1255 (1984) (internal citations omitted)). On one end of the spectrum are consensual encounters, which "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (internal citations omitted)). "On the opposite extreme are arrests, which are 'characterized by highly intrusive or lengthy search or detention.'" *Id.* (quoting *Cooper*, 733 F.2d at 1363). An officer needs "probable cause to believe" that the arrestee has committed a crime to effectuate a warrantless arrest. *Id.* (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

18

The third type of encounter rests somewhere in the middle and is known as a *Terry* stop or an investigative detention. *See id.* In an investigative detention, "[a]n officer 'can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver*, 209 F.3d at 1186 (internal citations omitted)). "The court views the totality of the circumstances to see whether the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* at 1123 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted)).

> ### 2. Plaintiff's initial seizure and questioning were part of a lawful investigative detention.

Plaintiff asserts he was immediately arrested when officers approached him with guns drawn, forced him to his knees, and handcuffed him after they interrupted the narcotics transaction between Quintero and the CS. (Doc. 51 at 13.) Plaintiff insists Defendants did not have probable cause to handcuff, detain, or question him, and the only reason Defendants did so was because Plaintiff "happened to be a Hispanic male (born in Mexico and possessing limited English skills) who was present at the scene of a crime committed by a business tenant." (*Id.* at 19.) Plaintiff argues in both his motion and in his response to Defendants' cross motion that it was his mere presence at 314 Mitchell, unsupported by any other evidence, that Defendants used as reason to detain him.

Plaintiff compares his detention to that in *Romero v. Story*, 672 F.3d 880, 883 (10th Cir. 2012), where officers responded to a call from a man stating that someone had vandalized his vehicle in an apartment parking lot; the man reported that he saw a Hispanic male in the same lot who then entered another apartment in the complex. (Doc. 51 at 16 (citing 672 F.3d at 883).) The

officers knocked on the door of the apartment and Romero, a Hispanic male, answered. *Romero*, 672 F.3d at 883. Romero saw the police, took a step or two back toward the apartment, and one of the officers knocked Romero to the ground with a leg sweep, handcuffed him, and placed him under arrest. *Id.* The Tenth Circuit found that Romero's "temporal and geographic proximity to the crime" was not sufficient to give the officers reasonable suspicion. *Id.* at 887. *Romero*, along with other cases Plaintiff cites regarding proximity, is distinguishable. (*See* Doc. 51 at 16–17 (citing *Ybarra v. Illinois*, 444 U.S. 85 (1979); *Poolaw v. Marcantel*, 565 F.3d 721 (10th Cir. 2009); *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996)).)

Far beyond the fact of Plaintiff's mere proximity to the transaction, officers had reasonable suspicion to detain Plaintiff based on the following facts and circumstances known prior to either interrogation: (1) Quintero insisted on meeting at 314 Mitchell; (2) Quintero said "it's just me and my boss" to the CS and tried to lure the CS onto Plaintiff's property; (3) officers observed traffic coming and going to and from the property in the time prior to the transaction, which in Defendant Davis's experience is consistent with quick purchases of drugs; (4) Officer Montano identified Plaintiff as possibly acting as a lookout; (5) the area where Plaintiff's property is located is a prominent area for drug dealing; and (6) in Defendant Davis's experience, the person handling the drugs is often not the owner of the drugs, and the owner is often close to the transaction in order to protect the drugs and to ensure s/he is not being cheated by the employee. The Court finds that Plaintiff's geographic proximity, combined with these other factors, was enough to give rise reasonable suspicion. *See Romero v. Story*, 672 F.3d at 888.

Plaintiff likens his detention to the unlawful search described in *Ybarra v. Illinois*, 444 U.S. at 91, but his reliance is misplaced. (*Id.* at 16.) As the Supreme Court later noted in *Michigan v. Summers*, "[t]he 'seizure' issue in this case should not be confused with the 'search' issue

presented in *Ybarra* . . . ." 452 U.S. 692, 695 n.4 (1981) (citing *Ybarra*, 444 U.S. 85). "In *Ybarra* the police[,] executing a search warrant for a public tavern[,] detained and searched all of the customers who happened to be present." *Id.* The plaintiff in *Ybarra* did not question "the legitimacy of the detention . . . ." *Id.* "Rather, the Court concluded that the search of Ybarra was invalid because the police had no reason to believe he had any special connection with the premises, and the police had no other basis for suspecting that he was armed or in possession of contraband." *Id.* (citing *Ybarra*, 444 U.S. at 90–93). In Plaintiff's motion for summary judgment, as in *Summers*, "only the detention is at issue." *Id.*

Plaintiff compares his encounter with Defendants to that in *United States v. Salas-Garcia*, a case with a somewhat similar set of facts. 698 F.3d 1242, 1246 (10th Cir. 2012). In *Salas-Garcia*, members of the Middle Rio Grande Narcotics Task Force—including Defendant Davis—used a confidential informant (CI) to arrange a buy-bust operation wherein the CI would purchase one kilogram of cocaine from Edgar Castaneda, whom the CI had identified as "a broker of large cocaine sales." *Id.* at 1246. The two planned to conduct the transaction in the public parking lot of a hospital. *Id.* On the day of the transaction, officers in unmarked cars followed Castaneda, who first stopped at a different parking lot. *Id.* Another vehicle, driven by Salas-Garcia, arrived in the lot shortly after Castaneda, and the two vehicles left at the same time, heading toward the hospital and "mimicking each other's lane changes." *Id.* Defendant Davis "knew from experience that drug traffickers often use two or three vehicles as a counter-surveillance technique to either elude law enforcement or to prevent the theft of the drugs they are delivering." *Id.* The two vehicles pulled into the hospital lot: "Castenada pulled into the hospital's Emergency Room parking lot and Salas–Garcia headed toward Pediatric Urgent Care on the south side of the hospital." *Id.* Another agent

saw a woman come from the hospital and get in Salas-Garcia's vehicle. *Id.* The agent "directed marked police units to stop both Castenada and Salas-Garcia in their respective vehicles." *Id.*

It is the woman Plaintiff focuses on. (Doc. 51 at 19–20.) After the agents stopped Salas-Garcia's vehicle, the woman told an agent "that the driver of the truck was her ex-husband, and that he had unexpectedly called to tell her that he would be picking her up from work." *Salas-Garcia*, 698 F.3d at 1246. The agent "concluded that she was not involved in the cocaine transaction and advised Ms. Salas–Garcia that she was free to leave." *Id.* Plaintiff contends that Defendants should have allowed him to leave after briefly questioning him. (Doc. 51 at 20–21.) Notably, the Tenth Circuit's opinion did not focus on the agent's decision to release *Mrs.* Salas-Garcia; the issue before the court was whether "the officers exceeded the scope of [*Mr.* Salas-Garcia's] *Terry* stop and lacked probable cause to handcuff and detain him prior to questioning." *Salas-Garcia*, 698 F.3d at 1248. At any rate, the situation facing the officers in *Salas-Garcia* is distinguishable from that facing Defendants on October 19, 2012. While both cases involved a large quantity of drugs and money, the safety concerns of the officers in *Salas-Garcia* do not appear to have been as heightened as those in this case. *Id.* at 1246. The encounter in *Salas-Garcia* occurred in a public parking lot—presumably the same kind of place Defendant Davis had tried to move the transaction to in this case because of the serious tactical disadvantages they faced at 314 Mitchell. *Id.* Additionally, from the officers' perspective, *Mr.* Salas-Garcia appeared to be intimately involved in the "counter-surveillance technique to either elude law enforcement or to prevent the theft of the drugs[,]" while there was no evidence or testimony that the officers believed *Mrs.* Salas-Garcia was so involved. *Salas-Garcia*, 698 F.3d at 1248. Here, Officer Montano gave Defendant Davis reason to believe that Plaintiff was acting as a lookout, and Quintero, urging the CS to complete the transaction inside, referred to the occupant of the building (Plaintiff) as his

22

boss, thereby giving Defendants at least three legitimate reasons to suspect Plaintiff was involved in the narcotics transaction.

Plaintiff cites language from *United States v. Melendez-Garcia*, where the Tenth Circuit noted that "'the use of firearms, handcuffs, and other forceful techniques' generally exceed[s] the scope of an investigative detention and enter[s] the realm of an arrest." *Cortez*, 478 F.3d at 1115–16 (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)). (*See also* Doc. 51 at 14.) Plaintiff tacitly acknowledges, however, that where there is "evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop[,]" such forceful techniques will not automatically render a seizure an arrest. *Melendez-Garcia*, 28 F.3d at 1052–53 (citing *United States v. Stewart*, 867 F.2d 581, 585–86 (10th Cir. 1989)). (*See also* Doc. 51 at 14 (citing *Melendez-Garcia*, 28 F.3d at 1053).)

Defendants have submitted testimony to demonstrate that the officers had legitimate safety concerns about the transaction: the building was in a high crime area of the city due to drugs and violence; another DEA agent had been to the building at 314 Mitchell during a previous drug investigation; surveillance of the location just prior to the transaction revealed other individuals going to and coming from the building, which was indicative of drug transactions; Defendant Davis knew from his training and experience that drug traffickers often protect their drugs with firearms, and he feared violence toward law enforcement personnel because of the very large quantity of drugs and money at stake in the transaction; the cul-de-sac would be difficult to secure for the officers' safety, but Quintero insisted on holding the transaction on the street or in the building; and Defendant Davis knew there was at least one person in the building whom Quintero

referred to as his "boss." Defendants assert that under these circumstances, the initial detention of Plaintiff was part of a lawful *Terry* stop. (Doc. 54 at 13–18.) The Court agrees.

"The use of handcuffs or placing suspects on the ground during a *Terry* stop 'do[es] not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment.'" *Salas-Garcia*, 698 F.3d at 1249 (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (internal and subsequent citations omitted)). "Officers may restrain an individual to 'maintain the status quo during the course of a *Terry* stop.'" *Id.* (quoting *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (internal citations omitted)). "But the use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (quotations omitted).

The facts in *Melendez-Garcia* provide an example of when "the 'quantum of force' used to seize the defendant was not reasonably necessary to promote safety." *Id.* at 1250 (citing *Melendez-Garcia*, 28 F.3d at 1053). In *Melendez-Garcia*, "DEA officers learned from a confidential informant that a transport of marijuana was planned, and officers set up surveillance of the address provided by the confidential informant." *Id.* (citing *Melendez-Garcia*, 28 F.3d at 1050). "DEA officers followed the defendant and the co-defendant as they left the provided address, and the officers then summoned marked police cars to stop the defendant's vehicle." *Id.* (citing *Melendez-Garcia*, 28 F.3d at 1050). "[T]he officers conducted a 'felony stop,' where the officers pulled out their weapons and pointed them at the defendant's car, told the occupants of the cars to throw out their keys and put their hands out, and told them to exit the vehicles one at a time and walk backwards toward the officers." *Id.* (citing *Melendez-Garcia*, 28 F.3d at 1053). "The officers then handcuffed and frisked the individuals." *Id.* (citing *Melendez-Garcia*, 28 F.3d at

24

1050). The Tenth Circuit "held that the stop was not justified under the *Terry* doctrine . . . ." *Id.* The court found the felony stop represented more force than was necessary where the officers "outnumbered the defendants, executed the stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders." *Id.* (quoting *Melendez-Garcia*, 28 F.3d at 1053).

The felony stop in *Melendez-Garcia* is distinguishable from the situation faced by Defendants. It is true that the officers here outnumbered the suspects, but the officers were going into the building at 314 Mitchell blind—they were uncertain of how many people were in the building and/or the two trailers on the commercial lot. Defendant Davis testified that it is common for drug dealers to protect their goods with guns; this is different than in *Melendez-Garcia* where the suspects were acting merely as couriers, not dealers. *See Melendez-Garcia*, 28 F.3d at 1049. Nor did the two men here fully comply with orders, in contrast to the suspects in *Melendez-Garcia*, 28 F.3d. at 1053: Quintero fled into the building when officers interrupted the transaction, and Plaintiff admitted that he did not fully comply with the officers' orders when they told him to get down on the ground.

Finally, the Court finds that the duration of the detention "was not unreasonably long." *United States v. Paetsch*, 782 F.3d 1162, 1175 (10th Cir.), *cert. denied*, 136 S. Ct. 195 (2015). The evidence shows that officers interrupted the transaction at 1:15 p.m., performed a cursory search of the area for officer safety, and Defendant Davis began Plaintiff's interrogation at 1:55 p.m. after he finished Quintero's interrogation. The Tenth Circuit does "not impose a rigid time limit on investigative detentions." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). "But the detention must 'not exceed the reasonable duration required to complete the purpose of the stop.'"

25

*Id.* (quoting *United States v. Rice*, 483 F.3d 1079, 1082 (10th Cir. 2007) (internal citation omitted)). Defendants' purpose in detaining Plaintiff was to determine whether he was involved in the narcotics transaction, and there is no evidence officers unduly delayed the detention. *See United States v. Villa–Chaparro*, 115 F.3d 797, 802–03 (10th Cir. 1997) (detention of over forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment).

While the 40 minute delay before Plaintiff's interrogation would not be considered a brief investigative detention by any stretch of the imagination, the Court finds that based on the totality of the circumstances—where the officers needed to perform a cursory search of the area for safety and Defendant Davis questioned Quintero first—the 40 minutes Plaintiff was detained before he was questioned was not unreasonable. "During that time, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Paetsch*, 782 F.3d at 1175–76 (finding that a 90 minute detention, "under the circumstances, . . . was 'no longer than reasonably necessary' to identify Paetsch as the bank robber and arrest him") (quotations omitted).

Based on the totality of the circumstances, the Court finds that Defendants had reasonable suspicion to detain Plaintiff, and the detention (including the fact that officers came in with guns drawn and then forced Plaintiff to his knees) was reasonably related in scope and duration to the circumstances that justified the detention. *See United States v. Shareef*, 100 F.3d 1491, 1500–01 (10th Cir. 1996) ("The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.") (quoting *Perdue*, 8 F.3d at 1462). The encounter between Plaintiff and Defendants was a lawful investigative detention from the moment he was detained throughout his interrogation, which is the time period specifically addressed in Plaintiff's motion for summary judgment. The Court will, therefore, deny Plaintiff's motion. The

Court turns next to whether Plaintiff's detention escalated into an arrest supported by probable cause following his interrogation.

### C.   The detention became an arrest after Defendants interrogated Plaintiff.

Defendants assert they had arguable probable cause to arrest Plaintiff following his interrogation. (Doc. 64 at 16–20.) Plaintiff counters that there was insufficient evidence for Defendants to have ever made a probable cause determination, after either his interrogation and/or the search of the building. (Doc. 66 at 17–20). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1122 (D.N.M. 2015) (quoting *United States v. Valenzuela*, 365 F.3d 892, 896–97 (10th Cir. 2004) (internal quotations omitted)). "Although '[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion.'" *Id.* (quoting *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal citation omitted)). Further, an arrest "must be supported by probable cause particularized with respect to that person." *Ybarra*, 444 U.S. at 91.

Plaintiff argues that there is no evidence demonstrating his direct involvement in the narcotics transaction. (Doc. 66 at 13–14.) Plaintiff asserts that Defendants' knowledge of the following factors should have outweighed any probable cause determination: (1) Plaintiff's name had never been mentioned by the CS in his conversations with Prieto or Quintero; (2) when officers asked Quintero if Plaintiff was involved in the transaction, Quintero said no; (3) Plaintiff told officers he was not involved in the transaction; (4) it would have been impossible for Plaintiff to see the transaction from where he was standing at the bay door; and (5) Plaintiff answered questions about the property and his past and current work. (*Id.* at 15–16.)

For purposes of the qualified immunity analysis, the Court may turn first to the second prong. *See Casalduc*, 982 F. Supp. 2d at 1242. "When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer *could have believed* that probable cause existed to arrest' the plaintiff." *Romero v. Fay*, 45 F.3d at 1476 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (emphasis added) (subsequent citations omitted)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Id.* (quoting *Hunter*, 502 U.S. at 227 (internal citation omitted)). "For the purposes of [the] qualified immunity inquiry, therefore, the relevant question is this: Could a reasonable officer in [Defendants'] position have believed that" there was probable cause to arrest Plaintiff for involvement in the narcotics transaction, even where Plaintiff and Quintero told the officers Plaintiff was not involved? *Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011).

While the parties have different perspectives about whether the facts and circumstances should have resulted in a determination of probable cause, there is no dispute about the facts themselves. Where material facts are not in dispute, the Court may decide whether the determination of probable cause was reasonable. *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) ("Whether the officers acted reasonably, however, is a legal determination in the absence of disputed material facts."). "Probable cause existed if 'at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing'" Plaintiff was involved in the narcotics transaction. *Hunter*, 502 U.S. at 228 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (internal citations omitted)).

When Defendant Davis arrested Plaintiff, he knew from experience that the lot is located in a prominent area for drug dealing, and he had word that another agent had been to 314 Mitchell before on a drug investigation. He knew officers had seen traffic indicative of drug transactions occurring on the property prior to the buy-bust operation, and he saw individuals come onto the property to purchase drugs while he interrogated Plaintiff and Quintero. He knew Quintero had insisted on the location and had attempted to lure the CS onto the property and into the building, assuring the CS that only he and his "boss" were present. He had word from Officer Montano that an individual in the building appeared to be acting as a lookout, and he knew from experience that the owner of the drugs is often close to the transaction. Plaintiff also partially corroborated Officer Montano's suggestion, as he said he had observed Quintero coming out of a trailer on the property.

Once Defendants interviewed Plaintiff and Quintero, they had information that Plaintiff owned and lived (at least part-time) on the property. At least Defendant Davis was under the mistaken impression that Plaintiff maintained a business on the property, but he did not think there were adequate signs of a business and thought it strange that Plaintiff could not tell him the names of his customers. Additionally, some of Plaintiff's answers made Defendant Davis wonder whether Plaintiff was involved in narcotics (i.e., Plaintiff indicated he "makes deals" to earn his money).

The undisputed facts establish that both Defendants are entitled to qualified immunity. Even if the Court found that probable cause did not exist to arrest Plaintiff, the Defendants "nevertheless would be entitled to qualified immunity because their decision was reasonable, even if mistaken." *Hunter*, 502 U.S. at 229 (citing *Anderson v. Creighton*, 483 U.S. at 641). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley*, 475 U.S. at 343). "This accommodation for reasonable error exists because 'officials should not err always on

29

the side of caution' because they fear being sued." *Id.* (quoting *Davis v. Sherer*, 468 U.S. 183, 196 (1984)).

It is true that "[a]ssociation with persons suspected of criminal conduct or nearness to the site of illegal activity does not alone suffice" to establish probable cause, *United States v. Dozal*, 173 F.3d 787, 792, 793 (10th Cir. 1999) (citations omitted), but clearly established Tenth Circuit precedent holds that "where there are facts in addition to one's association with someone engaged in criminal activity, as in this case, [the Court] must consider whether the 'totality of the circumstances' known at the time of the arrest established probable cause" *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216–17 (10th Cir. 1998), *cert. denied*, 525 U.S. 978 (1998) (citations omitted). Here, Defendant Davis did have circumstantial evidence of Plaintiff's involvement in the narcotics transaction. For example, Quintero assured the CS that only he and his "boss" were present. This is similar to *Dozal*, where the Tenth Circuit found probable cause may be based in part on a co-conspirator's "use of the words 'we' and 'us'" as evidence "that multiple persons played a role in the cocaine transaction." 173 F.3d at 793 (citing *Vazquez–Pulido*, 155 F.3d at 1216 n.5). Defendant Davis was also working under the impression that Plaintiff was acting as a lookout, which, together with his knowledge of the area and the building specifically, gave Defendant Davis reason to believe Plaintiff was involved. *See United States v. Leon-Chavez*, 801 F. Supp. 541, 546–47 (D. Utah 1992) (upholding a determination of probable cause where the officer knew drugs were present in a storage shed leased by a fugitive with a criminal record and noticed a suspect acting as a lookout). Finally, although Defendant Davis had information from Plaintiff and Quintero that Plaintiff was not involved in the transaction, an officer is not under an "obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially

discovered provide probable cause." *Romero v. Fay*, 45 F.3d at 1478 n.3 (quoting *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (internal citation omitted)); *see also United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir. 1986) (upholding warrantless arrest on the basis of circumstantial evidence, even though suspect proclaimed his innocence).

The Court finds that, under the totality of the circumstances, Defendants had arguable probable cause for arresting Plaintiff. *See Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir.), *cert. denied*, 135 S. Ct. 881 (2014) (citing *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)). Given the facts and circumstances known to Defendants after Plaintiff's interrogation, a reasonable officer could have believed probable cause existed for his arrest. Because "arguable probable cause exists, [P]laintiff has failed to show that the constitutional right was clearly established in the situation facing" Defendants. *Casalduc*, 982 F. Supp. 2d at 1243 (citing *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009)). Consequently, Defendants are entitled to qualified immunity, and the Court will grant Defendants' motion on this issue.[10] The Court will not reach the issue of whether probable cause existed for the arrest.

## V. Discussion on Count II: Malicious Prosecution and Related Denials of Due Process

Defendants first move to dismiss Plaintiff's claim for malicious prosecution on the basis that Plaintiff's claims arise under the doctrine created in *Bivens*, 403 U.S. 388. (Doc. 64 at 8–9.) The officers were acting as federal agents of the DEA, and Defendants contend that Plaintiff's claims pursuant to 42 U.S.C. § 1983—which applies to state actors—are not cognizable. (*Id.*)

---

[10] The Court finds that both Defendants are protected by qualified immunity for their respective roles in Plaintiff's arrest. Defendants argue that summary judgment should be granted as to Defendant Chavez on the basis that Chavez did not detain, arrest, or have any participation in Plaintiff's arrest. (Doc. 64 at 10.) Plaintiff disagrees, noting that Defendant Chavez participated in Plaintiff's interrogation. (Doc. 66 at 11.) The Court agrees there is evidence that Defendant Chavez participated in the interrogation, although it appears Defendant Davis took the lead in the arrest while Chavez took the lead in the search. (*See, e.g.*, Doc. 70-H.) To the extent Defendant Chavez did participate in Plaintiff's arrest, he is nonetheless protected by qualified immunity for the reasons discussed in this opinion.

Because neither the Tenth Circuit nor the Supreme Court have specifically authorized a *Bivens* claim for malicious prosecution, Defendants argue that Plaintiff's claim should be dismissed. (*Id.* (citing *Ingram v. Faruque*, 728 F.3d 1239, 1243 (10th Cir. 2013); *Kennedy v. Peele*, 552 F. App'x 787, 793 (10th Cir. 2014)).) Plaintiff asks the Court to refrain from answering the question of whether the officers, acting as part of a multijurisdictional task force, conducted the operation under color of state or federal law. (Doc. 66 at 23.) The Court does not need to decide whether the officers were acting under color of state or federal law, because Plaintiff's claim for malicious prosecution fails on the merits.

To establish a malicious prosecution claim under the Fourth Amendment, Plaintiff must demonstrate "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Stonecipher*, 759 F.3d at 1146 (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (internal citations omitted)). "Malice may be inferred if a defendant causes the prosecution without arguable probable cause." *Id.* (citing *Wilkins*, 528 F.3d at 800–01 (stating "malice may be inferred from intentional or reckless behavior")). The Court found that there was arguable probable cause to arrest Plaintiff. Plaintiff "offer[s] no other basis from which one can infer [Defendants] acted with malice . . . ." *Id.* at 1147. The Court will grant summary judgment to Defendants for Plaintiff's malicious prosecution claim.

## VI. Discussion on Counts III–V: Unreasonable Searches of Plaintiff's Home, Person, and Cell Phone

Plaintiff concedes that "[i]f the Court finds that the Defendants had probable cause to arrest Plaintiff, Plaintiff will not dispute that the search of his person was a valid search incident to

arrest." (Doc. 66 at 21.) The Court finds that Defendants had arguable probable cause to arrest Plaintiff; therefore, the search of Plaintiff's person incident to the arrest was lawful. *See Lavicky v. Burnett*, 758 F.2d 468, 474 (10th Cir. 1985) (noting that "a police officer, incident to an arrest, may search a person"); *see also Casalduc*, 982 F. Supp. 2d at 1245–46, 1248–49 (finding officer was entitled to qualified immunity based on arguable probable cause without deciding whether probable cause existed, and holding that officer's search of suspect was a valid search incident to arrest). Consequently, Defendants' motion will be granted with respect to the search of Plaintiff's person, and the Court will dismiss Count IV.

Defendants also point out that Plaintiff stated in his deposition that he did not have a cell phone on the day of the arrest. (Doc. 64 at 20 (citing Doc. 64-D at 21:19–22:11).) Defendants ask the Court to grant their motion and dismiss Count V on this basis. Plaintiff did not respond to this request in his response. (*See* Doc. 66.) Because Plaintiff is not alleging that Defendants illegally searched a cell phone he owned, he had no "legitimate expectation of privacy in the" contents of the phone. *United States v. Erwin*, 875 F.2d 268, 271 (10th Cir. 1989) (finding that officer did not violate Fourth Amendment rights of vehicle's passenger, where the passenger did not own vehicle or have any legitimate expectation of privacy in the vehicle). The Court agrees that Count V should be dismissed.

"[A] search incident to arrest may only include the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quotation omitted). The purpose of the limitation is to "protect[] arresting officers and safeguard[] any evidence of the offense of arrest that an arrestee might conceal or destroy." *Id.* (citation

33

omitted). The search of the remainder of the building at 314 Mitchell and the trailers, must have been pursuant to a valid search warrant. *See id.*

Plaintiff has established that there is a dispute of material fact about whether Defendant Chavez started to search the building at 314 Mitchell prior to the time Defendant Davis secured the search warrant. As described in Section II of this opinion, Agent Villegas reported that he assisted in securing the property, and he photographed the property, warehouse, and prisoners (including the package of cocaine). (Doc. 66-8, Villegas's Supp. Report at ¶ 8.) In the next paragraph, Agent Villegas asserts that he helped maintain security "until TFO Davis obtained a District Court Narcotics search warrant." (*Id.* ¶ 9.) Defendant Chavez's supplemental report stated that "[o]nce the property was photographed by Agent O. Villegas, Agent Chavez began a search." (*Id.*, Chavez's Supp. Report at ¶ 9.)

In addition, Defendant Chavez testified that between 30 and 50 individuals showed up sometime after 5:00 p.m. during the search, stating that their vehicles needed repair and they were there to talk to "Jose."[11] Conversely, Defendant Davis testified it was his understanding that many of the individuals who came to buy narcotics were there while he was away securing the warrant, which would have been prior to approximately 6:45 p.m. It is not clear to the Court whether Villegas photographed and Defendant Chavez searched the building before or after Defendant Davis secured the warrant. The Court will, however, grant Defendants' motion as to Defendant Davis on this Count, because there is no evidence he participated in any unlawful search of 314

---

[11] Plaintiff also disputes that 30 to 50 individuals stopped by the property to purchase narcotics and references Defendant Davis's testimony that "two or three [individuals] . . . said they were there to purchase drugs." (*See* Doc. 66 ¶ 31 (citing Doc. 66-4 at 75:5–6).) Defendant Davis's testimony, however, was only about the individuals he personally interviewed. (Doc. 66-4 at 75:5–6.) He is not testifying about the individuals who arrived while he was away securing the warrant. (*See* Doc. 64-B at 38:11–25.)

Mitchell, as he was off the property securing a warrant. The remainder of Defendants' motion is denied with respect to the search of the building and trailers.

## VII.  Conclusion

The Court denies Plaintiff's motion for summary judgment. With respect to Defendants' motion for summary judgment, the Court finds the following:

Count I: Plaintiff failed to establish that Defendants violated clearly established law, and Defendants are entitled to qualified immunity for the warrantless arrest. The Court grants Defendants' motion with respect to this issue and dismisses Count I.

Count II: Because Defendants had arguable probable cause for Plaintiff's arrest, Plaintiff has failed to establish an essential element of his malicious prosecution claim. Defendants' motion is granted as to this issue, and Count II is dismissed.

Count III: Plaintiff has raised a genuine dispute of material fact with respect to whether Defendant Chavez began the search of the building at 314 Mitchell before Defendant Davis secured the search warrant. The Court denies Defendants' motion with respect to Defendant Chavez on this issue and grants the motion with respect to Defendant Davis.

Count IV: Because Defendants had arguable probable cause to arrest Plaintiff, the search of Plaintiff's person was valid incident to his arrest. Defendants' motion is granted with respect to this issue, and Count IV is dismissed.

Count V: Plaintiff testified that he did not own the cell phone Defendants searched on October 19, 2012. Consequently, he has no legitimate expectation of privacy in the cell phone. Defendants' motion is granted with respect to this issue, and Count V is dismissed.

Finally, because there is no evidence regarding Defendant Davis's participation in an unlawful search of Plaintiff's property—the only claim remaining in the complaint—the Court will dismiss Defendant Davis from the case.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment on the Issue of Probable Cause to Arrest Jose Garcia (Doc. 50) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion for Summary Judgment on All Counts of the Complaint and Memorandum in Support (Doc. 64) is **GRANTED IN PART** as described herein.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**